## In re Y-L-
## In re A-G-
## In re R-S-R-

*Decided March 5, 2002*

U.S. Department of Justice
Office of the Attorney General

(1) Aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes" within the meaning of section 241(b)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B) (2000), and only under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible. *Matter of S-S-*, Interim Decision 3374 (BIA 1999), overruled.

(2) The respondents are not eligible for deferral of removal under Article 3 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment where each failed to establish that the torture feared would be inflicted by or with the acquiescence of a public official or other person acting in an official capacity. *Matter of S-V-*, Interim Decision 3430 (BIA 2000), followed.

### IN REMOVAL PROCEEDINGS

By previous Order, I directed the Board of Immigration Appeals ("BIA") to refer the above-captioned cases to me for review pursuant to 8 C.F.R. § 3.1(h)(1)(i) (2001). In three separate opinions, the BIA ordered that the respondents' removal from the United States be withheld under the provisions of section 241 of the Immigration and Nationality Act ("INA"). For the reasons set forth below, I now reverse the decisions of the BIA and hold that the respondents, having each been convicted of a "particularly serious crime" within the meaning of the INA, pose a danger to the community of the United States and are thus ineligible for withholding of removal.[1] *See* INA § 241(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii) (2000). I further conclude that the purported threats of torture claimed by the respondents if removed to

---

[1] My review of these BIA decisions is *de novo*. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make *de novo* factual determinations.").

their countries of origin do not satisfy the criteria for granting them deferral of removal.[2]  *See* 8 C.F.R. § 208.17.

## I.

The three respondents in this consolidated matter are foreign nationals who bear final judgments of conviction for felony drug trafficking offenses in the United States.  Specifically, Y-L- was convicted in the Martin County, Florida Circuit Court of trafficking in cocaine and resisting an officer with violence, in violation of Fla. Stat. Ann. §§ 893.135, 843.01 (West 2000 & Supp. 2002).  Although he was sentenced to just 25 months of incarceration, his drug offense was a first-degree felony under Florida law, punishable by up to 30 years' imprisonment.  A-G- was convicted in the United States District Court for the District of Delaware on three felony counts involving large quantities of cocaine:  two counts of distribution of cocaine, and one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841, 846.  He received concurrent sentences of one year and a day on each count.  R-S-R- pled guilty in federal court in the District of Puerto Rico to one felony count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.  The court sentenced him to 24 months of incarceration.

As a result of the respondents' aggravated felony convictions,[3] the Immigration and Naturalization Service ("INS") commenced removal proceedings against them.  *See* INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (any alien convicted of an aggravated felony is deportable); INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i) (any alien convicted of a controlled substance offense, other than minimal possession of marijuana for personal use, is deportable).  The respondents, claiming that their lives and/or freedom would be severely imperiled upon deportation to their countries of origin, petitioned for withholding of removal under both INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and Article 3 of the Convention Against Torture And Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture"),[4] 8 C.F.R. § 208.16 *et seq.*  The INS opposed

---

[2] This published decision is binding on the BIA and is intended to overrule any BIA decisions with which it is inconsistent.  *See Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law").  *See also* 8 C.F.R. § 3.1(g).

[3] The drug trafficking crimes for which respondents were convicted all fall within the INA's definition of "aggravated felony."  *See* INA § 101(a)(43)(B), 8 U.S.C. § 1101(a)(43)(B) (2000).

[4] The Convention Against Torture, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 23

(continued...)

these requests, arguing that the respondents were statutorily ineligible for such withholding by virtue of their convictions for "particularly serious crimes." *See* INA § 241(b)(3)(B)(ii); 8 C.F.R. § 208.16(d)(2).

Although two of the three respondents were denied all relief by immigration judges,[5] the BIA on appeal held that all three were entitled to withholding of removal under section 241 of the INA. Invoking its decision in *In re S-S-*, Interim Decision 3374, 1999 WL 38822 (BIA Jan. 21, 1999), the BIA in each case held that the aggravated drug trafficking felonies committed by respondents did not constitute "particularly serious crimes" for purposes of INA § 241(b)(3)(B)(ii). In reaching this conclusion, the BIA emphasized such factors as the respondents' cooperation with federal authorities in collateral investigations, their limited criminal history records, and the fact that they were sentenced at the low-end of the applicable sentencing guideline ranges. The BIA also determined that the respondents had each demonstrated a probability of persecution or torture if returned to their countries of origin.

## II.

Section 241(b)(3)(A) of the INA dictates that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." This restriction does not apply, however, if "the Attorney General decides that . . . the alien, *having been convicted by a final judgment of a particularly serious crime,* is a danger to the community of the United States." INA § 241(b)(3)(B)(ii) (emphasis added).[6] The resolution of these cases turns on whether each of the respondents was convicted of a "particularly serious crime" within the meaning of section 241(b)(3)(B)(ii).

---

(...continued)

I.L.M. 1027 (1984), was approved by the United States Senate on Oct. 28, 1990. *See* 136 Cong. Rec. 36625 (1990). Regulations implementing the Convention were adopted pursuant to a congressional directive in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2681-822. *See* 64 Fed. Reg. 8478, 8488 (Feb. 19, 1999).

[5] In the cases of Y-L- and R-S-R-, the presiding immigration judges denied all requested relief from removal. A-G-, however, was granted withholding of removal in immigration court.

[6] The regulations implementing the Convention Against Torture contain an identical exception. *See* 8 C.F.R. § 208.16(d)(2) (2001) ("[A]n application for withholding of removal under . . . the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the [INA].").

A.

Although the INA itself does not define the term "particularly serious crime," pertinent textual guidance is found in the final clause of section 241(b)(3), which provides, in relevant part:

> For purposes of [section 241(b)(3)(B)(ii)], an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

This provision establishes that aliens convicted of aggravated felonies and sentenced to at least five years of imprisonment are *automatically* deemed to have committed a "particularly serious crime." With respect to aggravated felony convictions for which a lesser sentence has been imposed, however, Congress explicitly empowered the Attorney General to make the relevant determination. Prior to today, the Attorney General has had no occasion to consider which aggravated felonies might amount to "particularly serious crimes" where the prison sentence imposed upon conviction is less than five years. Operating in this void, the BIA has seen fit to employ a case-by-case approach, applying an individualized, and often haphazard, assessment as to the "seriousness" of an alien defendant's crime. *See In re S-S-*, *supra*. Not surprisingly, this methodology has led to results that are both inconsistent and, as plainly evident here, illogical.

According to the BIA, the 1996 INA amendments in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 – which eliminated a provision declaring that *all* aggravated felonies are "particularly serious crimes"[7] – reflected Congress' desire to replace classifications based on the "category or type of crime that resulted in the conviction" with classifications "based on the length of sentence imposed." *See In re S-S-*, *supra*. I do not concur. The BIA's interpretation of these amendments places far too much weight on the first sentence of section 241(b)(3)'s final clause (the mandatory designation) and far too little weight on the final clause's second sentence (the grant of discretionary authority to the Attorney General). The fact that Congress designated as *per se* "particularly serious" every aggravated felony

---

[7] Prior to 1996, the INA mandated that "an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." INA § 243(h)(2), 8 U.S.C. § 1253(h)(2) (1994).

resulting in a term of incarceration of at least five years hardly reflects an intent to subordinate the nefarious or harmful *character* of a crime to mere secondary consideration, let alone remove it from the equation. While the imposition of certain harsh sentences may obviate the need to probe the underlying circumstances of a particular crime, the discretionary authority reserved to the Attorney General with respect to offenses from which less severe sentences flow is clearly intended to enable him to emphasize factors *other than* length of sentence.[8]

Exercising that authority under the INA, it is my considered judgment that aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes" within the meaning of section 241(b)(3)(B)(ii). Only under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible.[9]

Both the courts and the BIA have long recognized that drug trafficking felonies equate to "particularly serious crimes" in this context. In *Mahini v. INS*, 779 F.2d 1419 (9th Cir. 1986), for example, the Ninth Circuit upheld the BIA's determination that an alien's conviction for possession of heroin with intent to distribute, and aiding and abetting the distribution of heroin,

---

[8] This understanding is confirmed by the IIRIRA's legislative history. In the Conference Report explaining the current provisions of INA § 241(b)(3), Congress emphasized that "the Attorney General retains the authority to determine other circumstances in which an alien has been convicted of a particularly serious crime, *regardless* of the length of sentence." H.R. Conf. Rep. No. 104-828, at 216 (1996) (emphasis added).

[9] Some legal commentators and the BIA itself have intimated that Article 33 of the United Nations Convention Relating to the Status of Refugees ("Convention"), July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176, to which the United States is bound by its 1968 accession to the United Nations Protocol Relating to the Status of Refugees ("Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, 6225, 606 U.N.T.S. 267, 268, limits my authority to determine that certain categories of crimes are "particularly serious" under INA § 241(b)(3)(B)(ii). *See In re S-S-, supra.* Because both the Convention and the Protocol are silent as to the meaning of a "particularly serious crime," proponents of this view have relied upon various restrictive statements in the Handbook on Procedures and Criteria for Determining Refugee Status, a document issued by the Office of the United Nations High Commissioner for Refugees ("UNHCR"). The Supreme Court has made clear, however, that the comments contained in the Handbook are in no way binding upon me in my determinations under INA § 241. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427-28 (1999) (holding that the precatory comments contained in the Handbook are not binding on the Attorney General, the BIA, or United States courts); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987) (same).

constituted a "particularly serious crime" within the meaning of the INA. The court reached that conclusion notwithstanding the fact that the alien had been sentenced to only thirteen months' imprisonment for the crime in question. In so holding, the court noted that from the time the BIA first confronted the contours of "particularly serious crimes" in 1982, "*the Board has continually found convictions for drug possession and trafficking to be particularly serious, and the offenders a danger to the community.*" *Id.* at 1421 (emphasis added) (citations omitted). Similarly, in *Matter of U-M-*, 20 I&N Dec. 327 (BIA 1991), the BIA observed:

> We find that the crime of trafficking in drugs is *inherently* a particularly serious crime. The harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes. [citation omitted] Illicit narcotic drugs sold in the United States ruin or destroy the lives of many American citizens each year. Apart from the considerable number of people in this country who die of overdoses of narcotics or who become the victims of homicides related to the unlawful traffic of drugs, many others become disabled by addiction to heroin, cocaine, and other drugs. There are also many in this country who suffer crimes against their persons and property at the hands of drug addicts and criminals who use the proceeds of their crimes to support their drug needs. Additionally, a considerable amount of money is drained from the economy of the United States annually because of the unlawful trafficking in drugs. This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society. *As we find trafficking in drugs to inherently be a particularly serious crime, no further inquiry is required into the nature and circumstances of the respondent's convictions for sale or transportation of marihuana and sale of LSD.*

*Id.* at 330-31 (emphasis added); *accord Matter of Gonzalez*, 19 I&N Dec. 682, 684 (BIA 1988).

The propriety of the "particularly serious crime" presumption adopted in this opinion is further supported by the long-standing *congressional* recognition that drug trafficking felonies justify the harshest of legal consequences. *See, e.g.*, 8 U.S.C. § 1227(a)(2)(B) (deportation for controlled-substance violations); 8 U.S.C. § 1252(a)(2)(C) (no judicial review where alien's removal is predicated on a drug trafficking felony); 8 U.S.C. § 1228 (expedited removal for aggravated felonies, including drug trafficking felonies); 18 U.S.C. § 3592(c)(12) (conviction for serious federal drug offenses constitutes aggravating factor for purposes of weighing imposition of federal death penalty); 21 U.S.C. § 862 (convicted drug traffickers subject to order of ineligibility for federal benefits). The fact that Congress, as part of the IIRIRA legislation in 1996, chose to jettison a prior INA rule treating *all* aggravated felonies – of which drug trafficking felonies are a subset – as *per se* "particularly serious crimes," should not be confused with an

indication that Congress no longer considered *drug trafficking crimes in particular*, to be as serious and pernicious as it had previously viewed them.

The severity of this legislative treatment has a solid foundation. The devastating effects of drug trafficking offenses on the health and general welfare, not to mention national security, of this country are well documented.[10] Because the illegal drug market in the United States is one of the most profitable in the world, it attracts the most ruthless, sophisticated, and aggressive traffickers. Substantial violence is present at all levels of the distribution chain. Indeed, international terrorists increasingly employ drug trafficking as one of their primary sources of funding.[11]

Based on the preceding discussion, I might be well within my discretion to conclude that all drug trafficking offenses are *per se* "particularly serious crimes" under the INA.[12] I do not consider it necessary, however, to exclude entirely the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short of that standard. While this opinion does not afford the occasion to define the precise boundaries of what those unusual circumstances would be, they would need to include, at a *minimum*: (1) a very small quantity of controlled substance; (2) a very modest amount of money paid for the drugs in the offending transaction; (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy; (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense; (5) the absence

---

[10] *See, e.g.*, Office of National Drug Control Policy, Executive Office of the President, *Drug-Related Crime* (Fact Sheets, March 2000); Bureau of Justice Statistics, U.S. Dep't of Justice, *A National Report: Drugs, Crime, and the Justice System* (Dec. 1992).

[11] *See, e.g.*, Drug Enforcement Administration, U.S. Dep't of Justice, *Target America: Traffickers, Terrorists & Your Kids – A National Symposium on Narco-Terrorism* (Dec. 4, 2001), *available at* http://www.usdoj.gov:80/dea/deamuseum/transcript.doc; *Drug Trade and the Terror Network: Hearing Before the Subcommittee on Criminal Justice, Drug Policy, and Human Resources of the House Committee on Government Reform*, 107th Cong. (Oct. 3, 2001) (statement of Asa Hutchinson, Administrator of Drug Enforcement Administration), *available at* http://www.usdoj.gov:80/dea/pubs/cngrtest/ct100301.html.

[12] Some federal courts have held that certain crimes may properly be treated as *per se* "particularly serious," regardless of the circumstances of the individual case. *See, e.g.*, *Gjonaj v. INS*, 47 F.3d 824, 825-26 (6th Cir. 1995) (assault with a firearm with intent to murder); *Hamama v. INS*, 78 F.3d 233, 240 (6th Cir. 1996) (felonious assault, possession of a firearm during a felony, and carrying a weapon in a vehicle); *Ahmetovic v. INS*, 62 F.3d 48 (2d Cir. 1995) (first degree manslaughter). Other courts have indicated that the application of "per se" determinations is legally questionable. *See, e.g.*, *Chong v. INS*, 264 F.3d 378, 387-89 (3d Cir. 2001).

of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles.  Only if *all* of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances (*e.g.*, the prospective distribution was solely for social purposes, rather than for profit) might justify departure from the default interpretation that drug trafficking felonies are "particularly serious crimes."   I emphasize here that such commonplace circumstances as cooperation with law enforcement authorities, limited criminal histories, downward departures at sentencing, and post-arrest (let alone post-conviction) claims of contrition or innocence do not justify such a deviation.[13]

## B.

On review of the records in the cases now before me, it is apparent that none presents the kind of extraordinary and compelling circumstances that might warrant treating the respondents' aggravated drug trafficking felonies as anything other than "particularly serious crimes."  Not only have all three respondents failed to demonstrate that the volume or value of controlled substances involved in their offenses was *de minimis* or inconsequential, but each was a direct actor or perpetrator – not merely a peripheral figure – in their respective criminal activities.

Y-L- was convicted of a first-degree drug trafficking felony involving 84 grams of cocaine and, in connection with that offense, was further convicted of resisting a police officer with violence when apprehended.  Y-L- BIA Decision at 2; Hr'g Tr. at 30.  The BIA declared that these crimes were not "particularly serious" because Y-L- had no criminal history, could have received a much stiffer sentence, and did not use a weapon or inflict personal injuries during the commission of the offenses.  *Id*. at 5.  The Board's decision has no merit.  As noted above, the fact that an alien has no prior convictions is irrelevant to the "particularly serious crime" calculus.  The same is true of a trial judge's decision to mete out a sentence at the low-end

---

[13] Although an alien's decision to provide critical information to law enforcement officials has no bearing on whether his offense is characterized as a "particularly serious crime," he may be granted legal status in the United States notwithstanding his criminal acts through the issuance of an "S visa."  *See* INA § 101(a)(15)(S), 8 U.S.C. § 1101(a)(15)(S).  Indeed, A-G- has sought such a visa, and his application is currently pending before the INS.  In the event that the application is ultimately granted, any order of removal against him will be vitiated.  However, the discussion in this opinion of the relief erroneously granted him by the immigration judge and BIA will remain unaffected.

of the guidelines. Furthermore, even assuming the BIA had some basis for believing that no weapons or physical injuries were involved in Y-L-'s crimes – a dubious assumption considering both that the record is entirely silent on this matter, and one of the counts of conviction had physical violence as a core element – the absence of such aggravating factors would not minimize the inherent dangers associated with Y-L-'s direct role in the drug trafficking offense.

A-G- was convicted of three federal drug felony counts, and stipulated that the amount of cocaine attributable to him for sentencing purposes was *1,330 grams*. A-G- Hr'g Exh. 13, at 3. That is enough cocaine to supply over 100,000 doses of the drug. *See United States v. Denmark*, 124 F.3d 200 (6th Cir. 1997) (Table), 1997 WL 468302. Yet the BIA ruled that the offenses did not rise to the level of "particularly serious crimes" inasmuch as A-G- "placed himself at great risk to obtain information on behalf of the FBI" and "received a substantially lower sentence because of his efforts." A-G- BIA Decision at 2-3. One does not follow from the other. While A-G-'s post-charge cooperation understandably secured a more lenient sentence, it did not retroactively alter the nature of the underlying offenses. The insidious quality of the crime remained the same.

Finally, R-S-R- pled guilty to participation in a conspiracy to produce cocaine in Puerto Rico and transport it in *multi-kilogram* quantities for subsequent distribution in New York. R-S-R- IJ Oral Decision at 7; Hr'g Tr. at 88-89. Nevertheless, the BIA adjudged his conviction not to be "particularly serious" under INA § 241(b)(3)(B)(ii) because "[h]e provided considerable information to the government," "spoke out at great physical risk to himself and his family," did not "directly or indirectly cause[] physical harm to any individual," and qualified for a "minor participant" sentencing adjustment based on his role as a courier in the conspiracy. R-S-R- BIA Decision at 6; United States' Motion Requesting Downward Departure Pursuant to [U.S.S.G. §] 5K1.1, at 2, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290. The Board's reasoning does not survive scrutiny. Not only is R-S-R-'s cooperation with federal authorities irrelevant in the "particularly serious crime" evaluation, but any scheme designed to transport cocaine in such large quantities necessarily exposed numerous individuals to physical harm. As for the sentencing adjustment, I find that a drug "courier" plays more than a sufficiently active part in a distribution conspiracy to render his conviction a "particularly serious crime."

III.

Although the respondents are statutorily ineligible for *withholding* of removal by virtue of their convictions for "particularly serious crimes," the regulations implementing the Convention Against Torture allow them to obtain a *deferral* of removal notwithstanding the prior criminal offenses if they can establish that they are "entitled to protection" under the Convention. *See* 8 C.F.R. § 208.17(a). To secure such relief, the respondents must demonstrate that, if removed to their country of origin, *it is more likely than not* they would be tortured by, or with the acquiescence of, government officials acting under color of law. *Id.* §§ 208.16(c)(2), 208.17(a), 208.18(a)(1). None of the respondents has come close to making such a showing.

### A.  *Y-L-*

Y-L-, who was paroled into the United States in 1979, maintains that he will be killed if sent back to his native Haiti.[14] He testified at his removal hearing that two months prior to his arrival in America, members of the Ton Ton Macoutes – a private army of Haitian death squads organized by former president François Duvalier and nurtured by his successor, Jean Claude Duvalier – murdered his father and aunt, and broke his cousin's leg as retribution for his father's unspecified criticism of the Duvalier government. Y-L- IJ Oral Decision at 3. Y-L- further insisted that the same group of people responsible for the death of his father killed his cousin in 1998, approximately twenty years after Y-L- initially left the country. *Id.* at 3-4, 8; Y-L- Hr'g Tr. at 11-15.

Y-L-'s claim for relief under the Convention Against Torture fails on at least two different levels. First, as the immigration judge correctly found, Y-L- produced no reliable evidence that he would likely be subjected to torture if returned to Haiti. Y-L- IJ Oral Decision at 8. While voluntarily visiting Haiti on two prior occasions, he was never personally harmed or threatened. *Id.* at 2-3. Although he suggested that his cousin was murdered by the same faction that purportedly killed his father nearly twenty years earlier, the immigration judge found this testimony speculative and

---

[14] The BIA did not address Y-L-'s claim for relief under the Convention Against Torture, deeming the issue moot in light of its decision to grant him withholding of removal pursuant to section 241(b)(3) of the INA. *See* Y-L- BIA Decision at 6. Having vacated the Board's ruling on Y-L-'s entitlement to withholding of removal, I must take up the deferral question. In so doing, I ultimately affirm the immigration judge's conclusion that Y-L- has no right to any relief under the Convention.

unconvincing.[15]  *Id.* at 8.  Meanwhile, the Department of State's authoritative asylum profile on Haiti, which was introduced at the removal hearing, reveals that the political climate has improved substantially in recent years, and that charges of politically-motivated persecution against individuals who fled during the Duvalier reign have proven to be frequently untrue or grossly exaggerated.  *See* Office of Asylum Affairs, Dep't of State, *Profile of Asylum Claims and Country Conditions – Haiti* 18, 21-22 (Mar. 31, 1998) ("Asylum Profile"); *see also Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999) (noting that State Department reports are the best resource for gleaning information on the political situations in foreign nations).

Second, even assuming Y-L-'s various allegations have some basis in fact, and even if his own alleged fears of torture are genuine, he is not entitled to deferral of removal under the Convention Against Torture because he has not established that *current government officials acting in an official capacity* would be responsible for such abuse.  The regulations implementing the Convention allow for relief only if torture would be "inflicted by or at the instigation of or with the consent or acquiescence of *a public official or other person acting in an official capacity*."  8 C.F.R. § 208.18(a)(1) (emphasis added).  Violence committed by individuals over whom the government has no reasonable control does not implicate the treaty.  *See In re S-V-*, Interim Decision 3430, at 9, 2000 WL 562836 (BIA 2000) ("To demonstrate 'acquiescence' by [foreign] Government officials, the respondent must do more than show that the officials are aware of the activity constituting torture but are powerless to stop it.  He must demonstrate that [the foreign] officials are willfully accepting of the . . . tortuous activities.").  The State Department's asylum profile on Haiti underscores that the Ton Ton Macoutes have effectively disbanded and neither play a role in, nor enjoy the tacit support of, the current Haitian government.  Asylum Profile at 23.  Both Y-L-

---

[15] Y-L-'s claims are strikingly similar to those made by another Haitian national whose application for protection under the Convention Against Torture was also denied.  *See Merisier v. INS*, No. 00-CIV-0393, 2000 WL 1281243 (S.D.N.Y. Sept. 12, 2000).  The alien in that case, Orentz Merisier, alleged that his father (who had worked for the prior Haitian government) had been persecuted, and that his uncle had been assassinated.  Because, he contended, "some of the opposition forces are still in hiding in Haiti . . ., [he] ha[d] a genuine fear for his life upon his return."  *Id.* at *3.  Like Y-L-, Merisier did not contend that he personally had been subjected to any past persecution or torture in Haiti.  The BIA denied relief, as did a federal district court in a subsequent habeas proceeding.  The court stressed that Merisier had "failed to suggest a coherent theory of who might want to torture him or why," and that "Haiti's violent past, and even Merisier's relatives' alleged participation in it, is not, without more, substantial grounds for believing that removing Mersier to Haiti would likely result in his being tortured."  *Id.* at *12.  *Accord Miguel v. Reno*, Civ. No. 00-3291, 2000 WL 1209375 (E.D. Pa. Aug. 25, 2000).

and his counsel conceded this point.  Y-L- Hr'g Tr. at 15, 33.  If, by some chance – which has certainly not been proven to be more likely than not – former Ton Ton Macoute elements seek revenge on Y-L- because of his relationship to his father, there is no competent evidence in the record indicating that the current Haitian administration would either participate in, or turn a blind eye to, such violence.  In short, Y-L- has failed to sustain his burden of establishing entitlement to deferral of removal.

### B.  A-G-

The evidence advanced by A-G- similarly falls far short of what is required to obtain relief under the Convention Against Torture.  At some point following his entry into the United States, A-G- decided to supplement his income as a maintenance worker by trafficking in illegal narcotics.  His supplier was his long-time friend and roommate, K-C-, who had a drug-dealing base in Jamaica.  A-G- Hr'g Tr. at 77-88.  As so often happens to those in the drug trade, A-G- was ultimately arrested by the FBI, charged with unlawful distribution of cocaine, and convicted on multiple counts of cocaine trafficking.  To minimize his exposure to prison, he agreed to assist federal law enforcement officials by participating in a number of controlled drug purchases designed to implicate K-C-.

During a period in which both K-C- and A-G- were temporarily incarcerated at the same facility, K-C- allegedly delivered a message to A-G- that he would be killed if he returned to Jamaica.  In addition, according to A-G-'s brothers and sisters, two or three men came to the family residence in Jamaica in either 1998, 1999, or 2000 – the dates and other key particulars diverged sharply among these witnesses – and inquired as to A-G-'s whereabouts.  At least one sibling claimed that these men were armed and made threats that A-G- would be murdered by K-C- or others if he returned to Jamaica. *Id.* at 154, 251.

Citing these apparent threats to his life, A-G- seeks to avoid removal pursuant to the Convention Against Torture.  The main problem with his claim is that the record is devoid of credible evidence suggesting that the Jamaican government would bear any responsibility – either direct or through passive acquiescence – for physical harm visited upon A-G-.  In fact, several of the witnesses candidly acknowledged at the hearing that no one in the family even reported the alleged threats to Jamaican authorities. *Id.* at 154, 174, 195, 245.

In finding some government role in the alleged torture, the presiding immigration judge speculated that the Jamaican "government cannot or will not control those who wish to persecute the respondent." A-G- IJ Oral Decision at 15. The judge's reasoning proceeded as follows: (i) there are major problems with corruption in Jamaica, (ii) local police routinely beat detainees, (iii) major drug traffickers operate in Jamaica with impunity and are cozy with corrupt law enforcement officials, and (iv) as a result of (i)-(iii), drug trade associates of K-C- may well either attack A-G- themselves or arrange for A-G- to be arrested on bogus charges and then encourage the corrupt local police to beat him. *Id.* at 10-17, 21-23.[16] Incredibly, the BIA found this reasoning both "thorough" and correct. I do not agree. To the contrary, the immigration judge's factual findings are clearly erroneous.

Although there are indications that corruption and brutality affect some elements of Jamaican law enforcement, the national government has undertaken substantial efforts at reform. *See* Office of Asylum Affairs, Dep't of State, *Country Reports on Human Rights Practices – Jamaica* 1 (Feb. 2001) ("Country Report"). For example, the Jamaican Parliament passed a major anti-corruption bill in December 2000, and recently ratified the Inter-American Convention Against Corruption. *See* Bureau for International Narcotics and Law Enforcement Affairs, Dep't of State, *Fact Sheet, Country Program: Jamaica* at 1 (Apr. 16, 2001). It also bolstered the national anti-money laundering laws. *Id.* Notwithstanding the allegations of A-G- and his family to the contrary, the U.S. State Department has found that the policy of the Jamaican government is to investigate all credible reports of police corruption. Bureau for International Narcotics and Law Enforcement Affairs, Dep't of State, *International Narcotics Control Strategy Report* (March 2000). The State Department has further reported that the Jamaican government does not encourage or facilitate the illicit production or distribution of narcotics. *Id.* at 4. While acknowledging that abuses by some members of the security forces occasionally occur, the State Department's 2000 Country Report for Jamaica makes clear that "[c]ivilian authorities generally maintain effective control of the security forces," and "[t]he Government generally respect[s] the human rights of its citizens." Country Report at 1. To be sure, there is room for improvement. But the record does

---

[16] The immigration judge explained his determination by stating: "[I]t seems that we have a situation where the drug lords may act on their own and simply pay the police to look the other way or the drug lords may actually get the police involved . . . so that they do the dirty work for them on the basis of a trumped up case. . . . We do not know which it is but one of the two is more likely than not." A-G- IJ Oral Decision at 23.

not support the extreme, uncorroborated claims made on behalf of A-G- with respect to knowing government acquiescence in prospective acts of torture.

Ultimately, of course, it is impossible to say with certainty whether A-G- will be exposed to torture by particular individuals upon his return to Jamaica. Those who engage in the illegal drug trade quite commonly expose themselves to the risk of violence; it is an occupational hazard. The relevant inquiry under the Convention Against Torture, however, is whether governmental authorities would approve or "willfully accept" atrocities committed against persons in the respondent's position. *See In re S-V-*, *supra*. To suggest that this standard can be met by evidence of isolated rogue agents engaging in extrajudicial acts of brutality, which are not only in contravention of the jurisdiction's laws and policies, but are committed despite authorities' best efforts to root out such misconduct, is to empty the Convention's volitional requirement of all rational meaning. As the courts have clearly recognized, relief is available only if the torture would "occur[] in the context of governmental authority," not "as a wholly private act." *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001). There being no such credible evidence in the case at bar, A-G-'s request for deferral must be denied.

## C.  R-S-R-

Turning to R-S-R-, a foreign national from the Dominican Republic who has resided in Puerto Rico continuously since his arrival there in 1985, it is clear that his application for relief under the Convention Against Torture suffers from largely the same maladies as those of the other two respondents.

Beginning no later than March 1997, R-S-R- entered into an elaborate "conspiracy to produce multi-kilogram quantities of cocaine in Puerto Rico which would then be transported to New York, where the cocaine would be sold." Plea and Cooperation Agreement at 13, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290. "[M]ultikilo quantities of cocaine" were also sold in Puerto Rico, thereby ensuring substantial profits from the conspiracy. *Id.*; R-S-R- Hr'g Tr. at 88-89. Subsequently, R-S-R- was arrested on federal drug charges. In an effort to reduce his prison sentence, he pled guilty and cooperated with federal authorities by testifying against several of his confederates in this "major cocaine trafficking organization." United States' Motion Requesting Downward Departure Pursuant to [U.S.S.G. §] 5K1.1 at 1-2, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290.

Invoking the Convention Against Torture, R-S-R- now seeks deferral of removal on the grounds that he will be subjected to physical cruelties by

individuals in the Dominican Republic – including two of his co-defendants who he maintains are corrupt law enforcement agents – angered by his decision to cooperate with authorities.  He claimed at his removal hearing that these individuals were key members of the conspiracy and were the initial source for the drugs that ultimately flowed into Puerto Rico.  He further testified that these individuals called his common-law wife in Puerto Rico and told her they were "waiting for [him]."  R-S-R- Hr'g Tr. at 105.  He alleged that they also arranged to have a note delivered to him in prison, which was unsigned, stating that they would "be waiting for [him] in Santo Domingo," and that he was "going to pay with [his] life."  *Id.* at 108.

The record indicates that R-S-R-'s testimony is highly suspect.  To begin with, as the immigration judge correctly observed in questioning R-S-R-'s credibility, R-S-R- produced no documentation to corroborate his claim that the drug conspiracy originated in the Dominican Republic.  R-S-R- IJ Oral Decision at 7-8.  Nor do any of the documents suggest even implicitly that Dominican citizens were involved in the operation.  *Id.* at 8.  To the contrary, the materials introduced at the hearing, including those offered by the respondent himself, reflect that the conspiracy operated exclusively in Puerto Rico and New York.  Although the immigration judge, at various pre-trial hearings, pointedly invited R-S-R- to subpoena (or secure affidavits from) the federal agents and prosecutors to whom he directed his cooperation so as to substantiate his claims, the respondent declined the invitation.  *Id.* at 6-7; R-S-R- BIA Decision at 4 n.5.

Corroborative evidence, of course, is not a threshold prerequisite to relief under the Convention Against Torture.  INS regulations provide that an applicant's testimony, "*if credible*, may be sufficient to sustain the burden of proof without corroboration."  8 C.F.R. § 208.16(c)(2) (emphasis added).  But where, as here, "the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal" to his claim.[17]  *Sidhu v. INS*, 220 F.3d 1085, 1090 (9th Cir. 2000).  And "the weaker [the] alien's testimony, the greater the need

---

[17] In the case at bar, the immigration judge stated that he was "unable to really separate what is true from what is an exaggeration.  The Court cannot really say what is true and what is not true."  R-S-R- IJ Oral Decision at 15.  The BIA, evaluating only the cold record, apparently disagreed and found that R-S-R-'s "testimony was credible in that it was internally consistent, consistent with his written applications, . . . and sufficiently detailed."  R-S-R- BIA Decision at 5.  Taking into account the immigration judge's ability to observe the testimony first-hand, and the detailed nature of his observations in this regard, I concur in the substantial reservations he memorialized in his opinion.

for corroborative evidence." *In re Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In any event, even assuming that the tentacles of this drug conspiracy reached into the Dominican Republic, R-S-R-'s allegation that he will be exposed to torture there is wholly unpersuasive. Despite testifying that it is easy to travel between Puerto Rico and the Dominican Republic, he stated emphatically that he felt safe from his former drug-dealing collaborators in Puerto Rico. R-S-R- Hr'g Tr. at 64-68. When the immigration judge asked him why, if travel between the two countries was so simple, the Dominican individuals he fears could not simply smuggle agents into Puerto Rico to seek their retribution against him, he was non-responsive. *See* R-S-R- IJ Oral Decision at 9-10, 16.

Furthermore, even if all of R-S-R-'s testimony was credited as true, he still would not be eligible for deferral of removal because he has not established the requisite governmental involvement in the prospective torture he portrayed. The scope of the Convention is confined to torture that is inflicted under color of law. It extends to neither wholly private acts nor acts inflicted or approved in other than "an official capacity." *Ali*, 237 F.3d at 597; 8 C.F.R. § 208.18(a)(1). While R-S-R- offered colorful testimony describing forms of torture that he "think[s] would happen to cooperating witnesses when they are deported," his testimony and evidence failed to provide a plausible basis for concluding that such practices would be inflicted upon *him* with the consent or approval of *authoritative government officials* acting in an *official capacity*. R-S-R- Hr'g Tr. at 108-09. If anything, his testimony indicates merely that two corrupt, low-level agents may seek to exact personal vengeance on him for personal reasons. Such private conduct falls far short of what is required to demonstrate the probability of government-sanctioned atrocities under the Convention Against Torture. Accordingly, R-S-R- is not entitled to relief.

### IV.

For all the foregoing reasons, the decisions of the BIA in each of these cases are reversed. The cases are remanded to the BIA for proceedings not inconsistent with this opinion.