RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0010P (6th Cir.)
File Name: 01a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ZAINAB ALI,

          *Petitioner*,

    *v.*

No. 99-4464

JANET RENO, Attorney
General; CAROL JENIFER,
District Director, United
States Immigration and
Naturalization Service;
IMMIGRATION AND
NATURALIZATION SERVICE,

          *Respondents*.

On Petition for Review of an Order of the
Board of Immigration Appeals.
No. A75 411 673

Argued: October 24, 2000

Decided and Filed: January 10, 2001

Before: DAUGHTREY and CLAY, Circuit Judges;
RUSSELL, District Judge.[*]

————————————

[*]The Honorable Thomas B. Russell, United States District Judge for
the Western District of Kentucky, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioner. Erin Albritton, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LIGITATION, Washington, D.C., for Respondents. **ON BRIEF:** Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioner. Erin Albritton, Brenda E. Ellison, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LIGITATION, Washington, D.C., for Respondents.

---

**OPINION**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. Zainab Ali petitioned the Immigration and Naturalization Service for asylum and for protection under the Convention against Torture and other Forms of Cruel, Inhuman or Degrading Treatment or Punishment. An immigration judge denied the petition, and on appeal the Board of Immigration Appeals affirmed the order. Ali now challenges the Board's finding that she had been firmly resettled in Denmark, thus making her ineligible for asylum, and its ruling that she did not warrant protection under the Convention. For the reasons stated below, we conclude that the Board's order must be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Zainab Ali is a native and citizen of Iraq. In August 1997, Immigration and Naturalization Service officials detained Ali for attempting to enter the country without proper authorization. The I.N.S. commenced proceedings to deport Ali to Iraq for attempting to enter the country without proper

authorization and with the aid of a fraudulent document. Subsequently, Ali filed an application for asylum. After the immigration judge determined that Ali was subject to removal for attempting to enter the country with a false Danish passport, he proceeded to address Ali's asylum claim, which was based on the following circumstances.

Ali's family is Shiite Muslim, and her father was a member of the opposition Al-Da'Wa party in Iraq during the 1970s. During this period, Ali's father went into hiding to escape threats and harassment from Iraqi authorities, and because of his absence, Ali's mother was subject to threats and detainment. Due to the constant threats and harassment, the family fled Iraq in 1980 and settled in Syria for ten years. In Syria, the family rented a home for shelter, Ali attended school, and Ali's father continued his affiliation and activities with Al-Da'Wa. Because of his political activities, Ali's father was arrested several times by Syrian authorities who endeavored to persuade him to relinquish his political affiliation and spy on Iraq.

In 1990, the family returned to Iraq to visit Ali's ailing grandmother and stayed approximately two months, until the Iraqi government discovered that they were in the country. According to Ali, the government pursued the family in a high-speed car chase, during which there was an accident in which Ali suffered serious injury, but Ali and her family escaped across the border into Syria.

The family remained in Syria for two months, during which time Ali, at the age of 17, married an Iraqi citizen. Shortly thereafter, Danish authorities accepted the family into Denmark as refugees. The Danish authorities issued Ali and her family passports and residence permits, and her family continues to live in Denmark. Ali, however, without notification to Danish authorities, utilized her Danish passport and returned to Syria after staying six months in Denmark. Using an Iraqi passport that she obtained during her visit to her grandmother, Ali obtained a visa and entered the United

States in 1990 to visit her husband, who had matriculated at an educational institution in Ohio.

Ali stayed in the United States for six years, during which time her visa expired, and she gave birth to two children who have United States citizenship. Following a visit from her mother, Ali and her children went to Denmark in April 1997, in response to information from her family that her father was seriously ill. Upon arrival, Danish authorities confiscated her passport because it had expired. They also informed her that she no longer had refugee status in Denmark and that she would be deported. Ali applied for asylum in Denmark, but her application was rejected.

Shortly after her arrival in Denmark, Ali discovered that the report of her father's illness was a ruse designed to persuade her to leave her husband. At one point during her five-month stay in Denmark, Ali was beaten and kicked by her father and three brothers because she refused to leave her husband. Apparently, the Danish police arrested the assailants, and an officer questioned Ali at a hospital. The Danish police report indicates that Ali told the police that she did not want her three brothers punished, although she wanted the authorities to admonish her brothers not to contact her any more. Ali testified that an officer said that he would instruct Ali's father and brothers not to bother her or go near her. However, when Ali herself requested that her brothers not be punished, the Danish chief of police decided not to pursue the case any further and released them from custody. According to Ali, after she was released from the hospital, she went to stay with her sister who lived in a location five hours from her parents' home. At her sister's home, one of Ali's brothers wielded a gun and threatened to kill her. Following this incident, Ali obtained the false Danish passport and returned to the United States with her children.

The immigration judge denied Ali's request for asylum and found her ineligible for withholding from removal. On appeal, the Board remanded the case and directed the immigration judge to correct some deficiencies in the record

This is not to say that domestic violence of the sort alleged in this case could never be the basis for relief under the Convention against Torture. In different circumstances, such as a situation in which the authorities ignore or consent to severe domestic violence, the Convention appears to compel protection for a victim. *See* Patricia A. Seith, Note, *Escaping Domestic Violence: Asylum as a Means of Protection for Battered Women*, 97 Colum. L. Rev. 1804 (1997); Barbara Cochrane Alexander, Note, *Convention Against Torture: a Viable Legal Alternative Remedy for Domestic Violence Victims*, 15 Am. U. Int'l L. Rev. 895 (2000); G. Kristian Miccio, *With All Due Deliberate Care: Using International Law and the Federal Violence Against Women Act to Locate the Contours of State Responsibility for Violence Against Mothers in the Age of Deshaney*, 29 Colum. Hum. Rts. L. Rev. 641 (1998).

## CONCLUSION

Despite the sad circumstances of this case, the petitioner's predicament cannot be solved without contradicting sound principles of asylum law. In short, there is no legally sufficient basis upon which to reverse the Board's decision to deny Ali's application for asylum and for protection under the Convention against Torture. We therefore AFFIRM the Board's order.

requirement mirrors the Senate's understanding of the term upon consenting to ratify the Convention, *see* 136 Cong. Rec. S17486-01, *S17491-92 (1990), and the interpretation of the United States Department of State upon the President's transmission of the Convention to the Senate. *See* Message from the President of the United States Transmitting the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, at 4 (1988). The Senate Committee on Foreign Relations stated that the purpose of this requirement "is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'" S. Exec. Rep. No. 101-30, at 9 (1990). The agencies implementing Article 3 concluded that 'acquiescence' "includes only acts that occur in the context of governmental authority." Regulations Concerning the Convention against Torture, 64 Fed.Reg. 8478, 8482 (1999). This interpretation corresponds to the understanding of the Department of State, which remarked that "the Convention applies only to torture that occurs in the context of governmental authority, excluding torture that occurs as a wholly private act or, in terms more familiar in United States law, it applies to torture inflicted 'under color of law.'" Message from the President of the United States Transmitting the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, at 4 (1988).

All considered, the Board's determination that the Danish police did not 'acquiesce' to torture against Ali is not manifestly contrary to law. The record shows that the Danish police arrested the assailants, incarcerated them during the investigation of Ali's charges, and offered to warn Ali's father and brothers not to harm her. The Board characterized the Danish police's actions as an "inability to control the activities" of Ali's family members, but it appears that this "inability" stems simply from Ali's refusal to allow punishment of her brothers. Because we conclude that the Danish police did not breach its "legal responsibility to intervene to prevent" torture, the Board's determination is manifestly not contrary to the law.

and rule on the motion to reconsider. On reconsideration, the immigration judge denied the request for asylum on the basis of his finding that Ali had firmly resettled in Denmark and thus was not eligible for asylum according to statutory dictate, but he granted her request for withholding of removal to Iraq and ordered instead that she be removed to Denmark or Syria. Ali now seeks reversal of the Board's order affirming that ruling.

### DISCUSSION

### A.  Firm Resettlement

The United States Attorney General possesses discretion to grant asylum to any alien she determines to be a refugee, 8 U.S.C. § 1158(b)(1), and a court may not reverse the Attorney General's determination unless the decision is manifestly contrary to the law and represents an abuse of discretion. *See id*. § 1252(b)(4)(D). On review, moreover, administrative factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *See id*. § 1252(b)(4)(B).

Under the recently enacted Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Pub.L. 104-208, 110 Stat. 3009), an alien may not obtain asylum if she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(A)(vi). Immigration regulations further provide that an alien is firmly resettled "if, prior to arrival in the United States, he or she entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement" 8 C.F.R. § 208.15 (2000). But even before the advent of IIRIRA and the express, statutory requirement with respect to resettlement, the Supreme Court declared that the presence of firm resettlement constituted a factor for mandatory consideration in asylum petitions. *See Rosenberg v. Woo*, 402 U.S. 49 (1971). In *Woo*, the petitioner fled China in 1953 and resided in Hong Kong until 1960 when he entered the United States on a visa. The petitioner remained in the United States, allowing his visa to expire.

After the I.N.S. commenced deportation proceedings in 1966, the petitioner applied for an immigrant visa claiming a preference as an alien fearing persecution from his Communist homeland. *Id*. at 50-51. In reviewing the Ninth Circuit's holding that the issue of firm resettlement was irrelevant to the petitioner's status, the Court noted that "the terms 'firmly resettled' and 'fled' are closely related to the central theme of . . . refugee legislation -- the creation of a haven for the world's homeless people." *Id*. at 55. The country's asylum laws were "enacted to help alleviate[] the suffering of homeless persons and the political instability associated with their plight. It was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives." *Id*. at 56. As a result, the Court held that firm resettlement "is one of the factors which the Immigration and Naturalization Service must take into account to determine whether a refugee seeks asylum in this country as a consequence of [her] flight to avoid persecution." *Id*.

The I.N.S. subsequently imported the firm-resettlement proscription into its asylum regulations, and various courts have echoed the rationale of the Supreme Court's opinion in *Woo*, although the issue has not been treated in a published opinion in this circuit. In *Yang v. Immigration and Naturalization Service*, 79 F.3d 932 (9th Cir. 1996), for example, the petitioners fled Laos and took refuge in France, where they remained for 14 years. In ruling that the I.N.S.'s firm resettlement regulation did not exceed the Attorney General's authority or reflect an impermissible construction of the asylum statute, the Ninth Circuit remarked that "Congress intended to give relief to individuals 'subject to persecution in their homelands.' Because firmly resettled aliens are by definition no longer subject to persecution, the [resettlement principle] creates no conflict with this aim." *Yang,* 79 F.3d at 939. Likewise, in affirming a ruling that an Iranian petitioner had firmly resettled in Spain for four years as he awaited a decision on his application for refugee status, the Eighth Circuit held that "[a]n alien will not be found to be firmly resettled in a third country 'if it is shown that his

inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or *acquiescence* of a public official or other person acting in an official capacity.

*See id*.§ 208.18(a)(1) (2000) (emphasis added).

The interpretation of 'acquiescence' represents the sole issue with respect to the application of the Convention to Ali's circumstances. Ali contends that the Danish police will acquiesce to the torture that will be inflicted by her father and brothers if she is removed to Denmark and, therefore, that she qualifies for protection under the Convention. The Board found that the Danish government's inability to control the activities of Ali's family members does not constitute acquiescence and that the Danish authorities did not wilfully ignore the actions of the family members. Based on the record now before us, we can only conclude that the Board's determination is not manifestly contrary to law.[3]

According to the regulations, "the term 'acquiescence' requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7) (2000). This

---

[3] We note with disapproval that the copy of the Danish immigration center report included in the Joint Appendix by counsel for the petitioner consisted only of the first page, which recounted the indignities visited upon Ali by her relatives. The second page of the report reflects the fact that "[when] interrogated by the police on August 18, 1997, Zainab Ali told them that she did not want her three brothers punished. However, she wanted them to be admonished not to get in touch with her nor to annoy her again. Considering these facts, the chief of police decided not to pursue the case any further, and the arrested men were released from Haderslev prison."

1994, and the obligations under the Convention went into effect for the United States on November 20, 1994. Because the United States Senate consented to ratify the Convention with the declaration that Convention articles 1-16 are not self-executing, *see* 136 Cong. Rec. S17486-01, S17492 (1990), Congress sought to conform immigration practices to the Convention with the passage of FARRA. *See* Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-821.[2] Pursuant to FARRA's directive instructing the appropriate agencies to implement the obligations of the United States under Article 3 of the Convention, *see* Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681, 2681-821, the I.N.S. and the Executive Office for Immigration Review have promulgated regulations for Convention claims.

Protection under the Convention exists in the form of withholding of removal to the country of torture. 8 C.F.R. § 208.16(c)(4) (2000). The applicant for withholding of removal pursuant to the Convention bears the burden of proof to "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *See id*. § 208.16(c)(2) (2000). In assessing the risk of torture, the adjudicator must consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant and evidence that the applicant is not likely to be tortured in another area of the country of removal. *See id*. § 208.16(c)(3)(2000). The regulations define torture as follows:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally

---

[2]Section 2242(a) essentially mirrors the protection provided by Article three of the Convention: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, 2681-821.

physical presence in the United States is a consequence of his flight in search of refuge.'" *Farbakhsh v. Immigration and Naturalization Service*, 20 F.3d 877, 881 (1994) (quoting *Matter of Soleimani*, Interim Decision No. 3118, 1989 WL 331872, at *7 (Board 1989)) (alterations in original); *see also Mussie v. United States Immigration and Naturalization Service*, 172 F.3d 329 (4th Cir. 1999) (finding firm resettlement for Ethiopian national who had lived in Germany for two years with German travel documentation, government assistance, a job, and an apartment); *Cheo v. Immigration and Naturalization Service*, 162 F.3d 1227 (9th Cir. 1998) (finding firm resettlement where Cambodians had lived peaceably in Malaysia for three years); *Vang v. Immigration and Naturalization Service*, 146 F.3d 1114 (9th Cir. 1998) (petitioner was firmly resettled in France where he had lived for 12 years with refugee status); *Abdalla v. Immigration and Naturalization Service*, 43 F.3d 1397 (10th Cir. 1994) (firm resettlement where Sudanese national had lived in the United Arab Emigrates for 20 years with a residence visa/permit).

The regulatory definition of firm resettlement captures the oft-repeated understanding that asylum is not granted to aliens who have found a haven from persecution: "An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement" 8 C.F.R. § 208.15 (2000). In view of this principle, we cannot find that the Board abused its discretion in finding that Ali was firmly resettled in Denmark. Ali was granted refugee status by the Danish government before she entered Denmark, and upon her arrival in that country she received a Danish passport and a residence permit. The finding that she received an offer of permanent resident status is buttressed by the evidence that her family has remained in Denmark for over ten years with refugee status.

Nevertheless, Ali has asserted that she satisfies the criteria for an exception to the firm resettlement bar. The regulations provide that the firm resettlement rule does not apply if an

alien establishes "[t]hat his or her entry into that nation was a necessary consequence of his or her flight from persecution, that he or she remained in that nation only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that nation. . . ." *See id.* § 208.15(a) (2000). Although Ali's entry into Denmark was arguably a necessary consequence of her flight from persecution, she did not remain there "only as long as was necessary to arrange onward travel." In fact, when queried about her reason for leaving Denmark in 1990, Ali responded that she left to get a visa and be with her husband, not continue her flight from persecution. Clearly, her journey back to Syria and then to the United States did not constitute flight from persecution. Furthermore, she clearly established significant ties in Denmark, even though she did not reside in that country for an extended length of time.[1]

---

[1] Notwithstanding our conclusion, we note that this exception reflects the understanding that refugees are not necessarily compelled to seek permanent resettlement in the first 'safe' country that they reach. As stated by the Supreme Court,

> Certainly many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way. Such stops do not necessarily mean that the refugee's aim to reach these shores has in any sense been abandoned. However, there are many refugees who have firmly resettled in other countries and who either never aimed to reach these shores or have long since abandoned that aim.

*Rosenberg v. Woo*, 402 U.S. 49, 57 n. 6 (1971); *see also Cheo v. Immigration and Naturalization Service*, 162 F.3d 1227, 1230 (9th Cir. 1998) (The firm resettlement regulation "does not mean that as soon as a person has come to rest at a country other than the country of danger, he cannot get asylum in the United States. Another country may have allowed only a temporary and not a permanent refuge. But where the duration and circumstances indicate that the asylum seeker may remain in the third country, then it is incumbent upon him to show the contrary."); *cf. Farbakhsh v. Immigration and Naturalization Service*, 20 F.3d 877, 882 (8th Cir. 1994) ("Petitioner's [four-year] stay in Spain was not a stopover en route to refuge in the United States.").

In addition, the Danish authorities' declaration that they are no longer obligated to accept Ali into their country does not undermine the Board's finding of firm resettlement. As noted by the Tenth Circuit, "[t]he pertinent regulations specifically focus on resettlement status *prior* to the alien's entry into this country; they thus preclude a deportable alien from bootstrapping an asylum claim simply by unilaterally severing [her] existing ties to a third country after arriving in the United States." *Abdalla*, 43 F.3d at 1400 (footnote omitted; emphasis added); *see also Vang*, 146 F.3d at 1117 (allowing third-country status to expire after entering the United States does not effect the finding of firm resettlement). Hence, we cannot conclude that the Board's determination was manifestly contrary to law or an abuse of discretion.

### B.  Convention against Torture

Article 3(1) of the Convention provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* February 4, 1985, S. Treaty Doc. No. 100-20, at 20 (1988), 23 I.L.M. 1027, 1028 (1984). Judicial review of Convention claims is available only when such claims are heard as part of the review of a final order of removal pursuant to 8 U.S.C. § 1252. *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, § 2242(d), 112 Stat. 2681, 2681-821; 8 C.F.R. § 208.18(e) (2000). Therefore, the applicable standard of review maintains that "a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law[,]" and, as mentioned above, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) and (C).

The United States deposited the instrument of ratification of the Convention with the United Nations on October 21,