# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2657

_____

| | | |
|---|---|---|
| Guillermo Eduardo Ramirez-Peyro, | * | |
| also known as Guillermo Eduardo | * | |
| Ramirez-Peyro, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of |
| v. | * | an Order of the Board of |
| | * | Immigration Appeals. |
| Eric H. Holder, Jr.,[1] | * | |
| Attorney General, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: March 10, 2009
Filed: August 4, 2009

_____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

This case involves the U.S. government's repeated efforts to remove from the country a former drug informant who has helped the government successfully prosecute and imprison several high-profile Mexican drug traffickers at great risk to

_____

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric H. Holder, Jr., is automatically substituted for Michael B. Mukasey as Respondent.

his own life. Guillermo Ramirez Peyro, a Mexican native and citizen, petitions for review of the decision of the Board of Immigration Appeals ("BIA") to deny him deferred removal under the Convention Against Torture ("CAT"). Ramirez Peyro claims that the BIA improperly interpreted one of the CAT's implementing regulations, 8 C.F.R. § 1208.18(a)(1), when denying him relief from removal and that, if removed to Mexico, he will be tortured or killed in retribution for his actions as an informant. We grant Ramirez Peyro's petition for review.

I.

This is not the first time that Ramirez Peyro has petitioned this court for review of a BIA decision to deny him relief under CAT. The facts of his case are set out in our prior opinion, <u>Ramirez-Peyro v. Gonzales</u>, 477 F.3d 637, 638–41 (8th Cir. 2007), and we recite here only those facts relevant to this particular appeal.

Ramirez Peyro became involved in the Mexican drug-trafficking trade after leaving his job with the Mexican highway police in 1995. While involved in the trade, he oversaw the warehousing and distribution of large amounts of cocaine and was involved in other illicit activity in Mexico. In 2000, Ramirez Peyro became a confidential informant for the U.S. Immigration and Customs Enforcement ("ICE") and infiltrated the Carillo Fuentes Cartel ("Cartel"), also known as the Juarez Cartel, in Mexico on ICE's behalf. As an ICE informant, Ramirez Peyro testified that he witnessed Mexican police officers murder individuals at the behest of the Cartel, saw Cartel members participate in many other killings in the presence of Mexican police officers, and further witnessed police cover-ups of those crimes.

Based on his observations during his tenure as an informant, Ramirez Peyro facilitated the U.S. government's arrest of approximately fifty individuals, including Heriberto Santillan, a top lieutenant in the Cartel. In addition to helping U.S. efforts to curtail the drug trade, Ramirez Peyro provided a statement to a representative of the Mexican government implicating Santillan in murders of the Cartel's rival drug

-2-

traffickers. In that statement, Ramirez Peyro confessed to his involvement in numerous criminal activities while in Mexico.

It is undisputed that based on his work with the U.S. government there have been two attempts on Ramirez Peyro's life. One attempt occurred in El Paso, Texas, and the other attempt occurred in Juarez, Mexico. Following the second attempt on his life, and believing him to be an integral part of its case against Santillan, the United States placed Ramirez Peyro into protective custody in 2004. While detaining him, the U.S. government has taken efforts to ensure that Ramirez Peyro is semi-isolated from the general prison population, and the record includes a list of over forty-five individuals in prison who may wish to harm him based on his work for the United States.

To date, the U.S. government has paid Ramirez Peyro approximately $220,000 for his work. Additionally, in exchange for his help, the U.S. government has provided Ramirez Peyro with immunity from prosecution, and, as the Government acknowledges, the United States paroled Ramirez Peyro and his family into the country "for their safety." See 8 U.S.C. § 1182(d)(5)(A) (authorizing the Attorney General to parole into the country persons for "urgent humanitarian reasons").

Ramirez Peyro's testimony from 2005 and 2007 hearings before an Immigration Judge ("IJ") indicates that there was some discussion regarding a grant of immunity from prosecution in Mexico, but there is no written documentation to that effect and there are no details of that alleged offer in the record. In the 2005 opinion granting CAT relief, the IJ stated that Ramirez Peyro "believes that he was promised immunity in Mexico regarding [his] statement [to Mexican authorities]." In the 2007 opinion, the IJ similarly indicated that Ramirez Peyro "states that he was . . . offered immunity from prosecution in Mexico by an anti-drug trafficking authority there." The IJ did not determine that Ramirez Peyro was, in fact, offered such immunity or the precise parameters of that grant. The IJ only determined that Ramirez Peyro

believed there was some agreement. Furthermore, unlike the United States, the Mexican government has not offered Ramirez Peyro protection from those who wish to harm him, and the IJ found there is no effective witness-protection program in place that would shield Ramirez Peyro from harm.

While Ramirez Peyro was paroled into the United States in connection with his work for U.S. agencies, he has never been admitted within the meaning of the Immigration and Nationality Act. As a result, Ramirez Peyro was placed into expedited removal proceedings when his parole permit expired on January 14, 2005. Ramirez Peyro claims that ICE had agreed orally to give him legal-permanent-resident status in the United States in consideration for his work as an informant, so he was surprised when he was placed in removal.

A. First Hearing Before the Agency

During Ramirez Peyro's first hearing before an IJ in 2005, he conceded removability. He also conceded that he was ineligible for asylum and withholding of removal because of his criminal record. See 8 U.S.C.§ 1231(b)(3)(B)(iii). He maintained, however, that he was entitled to deferral of removal under the CAT, asserting that he feared torture and death at the hands of the Cartel and of Mexican law enforcement acting on the Cartel's behalf. Ramirez Peyro alleged that all levels of the Mexican police have illicit connections to drug trafficking and that Mexican authorities, including Mexico's Federal Agency of Investigation, regularly reveal the identities of informants to the drug cartels, which has led to at least one informant's assassination.

In addition to Ramirez Peyro's testimony at the 2005 hearing, both parties submitted extensive documentary evidence confirming (1) the close relationship between Mexican law enforcement, politicians, and drug cartels; (2) the frequent involvement of police officers and military personnel in violent crimes; (3) Ramirez Peyro's relationship with ICE; (4) the U.S. government's concern for his safety both

-4-

in Mexico and while in protective custody in the United States; and (5) Ramirez Peyro's role as an ICE informant and the resulting threat that he now faces.

On August 11, 2005, the IJ found Ramirez Peyro to be a credible witness and granted deferral of removal under the CAT. See 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). On appeal, the BIA did not find any error with the IJ's credibility or factual determinations but nevertheless reversed the IJ on two bases. First, the BIA found that Ramirez Peyro was not entitled to relief because he had failed to establish that the harm he faced would more likely than not be inflicted by government officials or with their consent or acquiescence. And, second, the BIA determined that the threat to Ramirez Peyro was localized.

Ramirez Peyro appealed to this court, claiming that the BIA had incorrectly reviewed the IJ's findings of fact de novo and improperly engaged in its own fact finding. See Ramirez-Peyro, 477 F.3d at 640. We held that the BIA had, in fact, applied an erroneous standard of review and engaged in improper fact finding with regard to Ramirez Peyro's ability to relocate within Mexico. Id. at 641. We then remanded the case for specific factual findings regarding the plausibility of internal relocation in Mexico and the Mexican government's acquiescence to drug traffickers and those public officials helping them. Id. at 641–42. On remand from this court, the BIA, in turn, remanded the case to the IJ to perform the requisite fact finding.

B. Second Hearing Before the Agency

To address this court's concerns, in 2007 the IJ heard additional testimony and conducted additional fact finding based on the parties' submissions of supplemental evidence on the country conditions in Mexico and the Mexican President's attempts to control drug traffickers. In its October 11, 2007 opinion, the IJ extensively outlined all of the documentary evidence both parties had submitted on remand. It discussed, in particular, the 2007 U.S. State Department Country Report on Mexico ("Report"),

which the IJ believed evidenced a "deeply entrenched culture of impunity and corruption in [Mexico's government], particularly at the state and local level."

The IJ noted that Mexican "police and security forces" had been involved in "unlawful killings" and that "there were numerous reports of executions carried out by rival drug cartels, whose members allegedly included both active and former federal, state, and municipal security forces." The IJ further indicated that the Report provided support for Ramirez Peyro's claim that "police were involved in kidnaping, extortion, and providing protection for, or acting directly on behalf of, drug traffickers." The IJ also outlined evidence indicating that the Mexican President had begun efforts to curtail drug trafficking, its accompanying violence, and the corruption within the police and military forces. The IJ determined, however, that despite the Mexican government's good intentions, the success of such efforts remained to be seen. "[I]n light of the serious [consistent] documentation submitted," the IJ again found Ramirez Peyro's "testimony to be credible."

Addressing this court's concerns specifically, the IJ found that internal relocation within Mexico was not an option because of the nationwide reach of the Cartel and its affiliates, the publicity surrounding Ramirez Peyro's case, and the fact that his return to Mexico would be known to Mexican officials based on normal deportation procedures. The IJ further concluded that it was more likely than not that Ramirez Peyro would be tortured within the meaning of the CAT by government officials or with the acquiescence of such officials. Specifically, the IJ concluded that while

> the current government of Mexico . . . at its highest levels does oppose narcotic trafficking and corruption [,] . . . there is not a requirement that the head of a government be involved or acquiesce in torture before [CAT] relief can be granted. . . . [The regulation] does not limit what public official we are talking about. It does not require that the public official be . . . carrying out the official policy of the government. Rather, . . . this [acquiescence] language is in [the regulation] to protect an

-6-

individual from abuse by governmental authorities, whether they are acting in carrying out the policy of the government or not.

The IJ then determined that the witness-protection program in Mexico was inadequate to protect Ramirez Peyro and that "people within the Mexican law enforcement community . . . would either harm [him] themselves or acquiesce in placing him into a position where he would be killed by the cartel."

The Government appealed, and on July 9, 2008, the BIA again reversed the IJ. The BIA explicitly found "no clear error in the [IJ's] positive credibility finding or his other factual findings," but it concluded that Ramirez Peyro had failed to show "that the torture or harm he fear[ed] would be the result of a public official or officials in Mexico 'acting in an official capacity' or 'under color of law.'" The BIA further opined that, even assuming that public officials did not actually conduct the torture but consented to or acquiesced in the Cartel's use of torture, the officials' consent or acquiescence would likewise "not be . . . under the pretense of law." Rather, the officers "would be following a purely personal pursuit, completely unrelated to the law enforcement powers and responsibilities entrusted to them by Mexico."

The BIA relied on an Attorney General decision equating "acting in an official capacity" to "under color of law," and it looked to civil-rights case law interpreting "under color of law" to define more precisely the applicable legal standard in the CAT context. See In re Y-L, 23 I. & N. Dec. 270, 285 (AG 2002). In conducting its analysis, the BIA determined that "action under color of law will be found where a public official possesses the authority or something akin to but broader than 'apparent authority' to act . . . but exceeds such authority in a given case, even where the excessive nature of the action is so great as to constitute a crime." Applying that definition to the facts of Ramirez Peyro's case, the BIA determined that, even assuming public-official involvement in Ramirez Peyro's almost-certain torture and assassination, the officials would "lack the pretense of authority" to torture or assassinate or acquiesce in the torture or assassination of Ramirez Peyro because there

is "no actual or purported relationship between an officer's collusion with a drug cartel . . . and such officer's duties as a police officer." Absent this relationship, the BIA found that the officers would not be acting "under the color of law" in a manner that implicated the CAT.

To support the absence of such a nexus, the BIA focused heavily on its conclusion that the Mexican government had provided Ramirez Peyro with immunity from prosecution in Mexico. The BIA stated, "Notably, the evidence does not support the conclusion that it is more likely than not that an official in Mexico would arrest [Ramirez Peyro] . . . He has provided a statement to the Mexican authorities regarding his work as an informant in the United States and was promised immunity in Mexico regarding this statement." Because of this immunity, the BIA concluded that there would be no legal basis upon which Mexican law-enforcement officials could detain Ramirez Peyro under the pretense of law. According to the BIA, any detention or harm visited upon Ramirez Peyro would thus necessarily fail to be within the detaining officers' official capacities. This timely appeal followed.

II.

We review the agency's conclusions of law "de novo, with substantial deference to interpretations of statutes and regulations administered by the agency." Habtemicael v. Ashcroft, 370 F.3d 774, 779 (8th Cir. 2004).

Article III of the United Nations Convention Against Torture, as implemented in the United States, prohibits this country from removing an alien to a nation where it is "more likely than not" that the person will suffer torture. 8 C.F.R. § 1208.16(c)(2); see generally id. §§ 1208.16–.18. The regulations implementing CAT, in relevant part, define "torture" as "any act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed." Id. § 1208.18(a)(1). The "pain or

suffering" must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id.

The regulations define "acquiescence of a public official" as "requir[ing] that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." Id. § 1208.18(a)(7). We have held that the inquiry into whether a government acquiesces "centers upon the willfulness of a government's non-intervention," stating "A government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but it does cross the line into acquiescence when it shows willful blindness toward the torture of citizens by third parties." Mouawad v. Gonzales, 485 F.3d 405, 413 (8th Cir. 2007) (internal citations and quotations omitted).

In sum, based on this standard, there are two ways Ramirez Peyro could prevail on his CAT claim. First, he could show that public officials, acting in their official capacities, will more likely than not actually inflict or instigate the harm. Alternatively, he could show that public officials, again acting in their official capacities, will more likely than not have awareness of the torturous actions of private individuals (or of public officials acting in their personal capacities) and breach their responsibility to intervene to prevent those actions, whether because they accept the practices or are willfully blind to their commission.

As explained below, we find reasonable the BIA's legal conclusion that "official capacity" is analogous to "under color of law." We hold, however, that the BIA misunderstood and misapplied the parameters of "under color of law," leading it to conduct improper factual findings when applying that standard to Ramirez Peyro's case. Further, we believe that this misstep, in part, caused the BIA to give inadequate treatment to the acquiescence prong of Ramirez Peyro's claim.

-9-

A. Legal Standard for "Acting in An Official Capacity."

To resolve this appeal we must first address the meaning of "acting in an official capacity" under 8 C.F.R. § 1208.18(a)(1). While the regulations do not define the term, as noted above, the Attorney General has interpreted that phrase to mean "under color of law." See In re Y-L, 23 I. & N. Dec. at 279, 285. As support for this conclusion, the Attorney General cited a Sixth Circuit case, id. at 285, outlining the legislative history of CAT's implementation in the United States. See Ali v. Reno, 237 F.3d 591, 596–97 (6th Cir. 2001). That case, in turn, noted that "'the Convention applies only to torture that occurs in the context of governmental authority, excluding torture that occurs as a wholly private act or, in terms more familiar in United States law, it applies to torture inflicted under color of law.'" Id. at 597 (quoting Message from the President of the United States Transmitting the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, at 4 (1988) (internal quotation omitted)); see also id. ("[A]cquiescence 'includes only acts that occur in the context of governmental authority.'" (quoting Regulations Concerning the Convention against Torture, 64 Fed. Reg. 8478, 8483 (1999))).

"If the agency's interpretation [of its regulation] is reasonable, we cannot replace it with our own judgment." Miranda v. INS, 139 F.3d 624, 626 n.2 (8th Cir. 1998); see also Reyes-Vasquez v. Ashcroft, 395 F.3d 903, 906 (8th Cir. 2005) ("The Attorney General . . . acts within his authority delegated by Congress when he creates and interprets regulations to accomplish his immigration management task."); Habtemicael, 370 F.3d at 779 (providing for substantial deference to the agency's interpretation of its regulations). "We 'need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.'" Amador-Palomares v. Ashcroft, 382 F.3d 864, 868 (8th Cir. 2004) (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n.11 (1984)).

-10-

While our circuit has yet to adopt the agency's interpretation of "in an official capacity" as the equivalent of "under color of law" as used in the civil-rights context as reasonable, we do so now.  Accord Ahmed v. Mukasey, 300 F. App'x 324, 327–28 (5th Cir. 2008) (unpublished) ("To prove entitlement to . . . [the] CAT, the applicant must demonstrate that . . . it is more likely than not he would be tortured by, or with the acquiescence of, government officials acting *under color of law*." (emphasis added)); Bankole v. INS, 126 F. App'x 503, 504 (2d Cir. 2005) (unpublished) (referring to "color of law" under CAT analysis).  We thus consider the meaning of "under color of law" to outline the parameters of relief available to Ramirez Peyro under CAT.

A public official "acts under color of law when he misuses power possessed by virtue of . . . law and made possible only because he was clothed with the authority of . . . law."  United States v. Colbert, 172 F.3d 594, 596 (8th Cir. 1999) (citing West v. Atkins, 487 U.S. 42, 49 (1988)); see Screws v. United States, 325 U.S. 91, 111 (1945) ("It is clear that under 'color' of law means under 'pretense' of law. . . . Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.").  It has been "firmly established" that a public official acts under color of law when that official "abuses the position given to him by the State."  West, 487 U.S. at 49–50.  In essence, to find whether an official acts under color of law, we look to see whether a sufficient nexus exists between the official's public position and the official's harmful conduct.  See Colbert, 172 F.3d at 597; Roe v. Humke,  128 F.3d 1213, 1216 (8th Cir. 1997) ("[Whether] a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.").  "Absent any actual or purported relationship between the officer's conduct and his duties as a police officer, the officer cannot be acting under color of state law."  Roe, 128 F.3d at 1216.

This nexus inquiry is necessarily fact intensive, and, in the context of police officers, includes considerations such as whether the officers are on duty and in uniform, the motivation behind the officers' actions, and whether the officers had access to the victim because of their positions, among others. See Colbert, 172 F.3d at 597; Roe, 128 F.3d at 1216 (finding an officer's actions were not under the color of law when the officer was not on duty, was not in uniform or wearing his badge, did not specifically invoke his status, was not in a place where only officers had authority to be, and did not threaten to use official authority in the future); see also United States v. Christian, 342 F.3d 744, 751–52 (7th Cir. 2003) (surveying cases and outlining relevant factors).

Additionally, the rule does not require that the public official be executing official state policy or that the public official be the nation's president or some other official at the upper echelons of power. Rather, as we and the Supreme Court have repeatedly held, the use of official authority by low-level officials, such a police officers, can work to place actions under the color of law even where they act without state sanction. See Screws, 325 U.S. at 111. It is because of this that we find flawed the Government's argument that because "the record . . . reflects that the Mexican government opposes corruption and collusion with drug cartels at its highest levels," these officials could only be acting for "personal gain." Undoubtedly, it is not contrary to the purposes of the CAT and the under-color-of-law standard to hold Mexico responsible for the acts of its officials, including low-level ones, even when those officials act in contravention of the nation's will and despite the fact that the actions may take place in circumstances where the officials should be acting on behalf of the state in another, legitimate, way.

B. Improper Application of "Official Capacity" Analysis

The Government argues that the BIA correctly applied the under-the-color-of-law standard outlined above when determining that law enforcement officers' harm of Ramirez Peyro would not be in their official capacities. Ramirez Peyro counters

that, even assuming the BIA correctly determined the legal standard for "acting in an official capacity," it too narrowly construed that standard and erred in applying that standard to the facts because the BIA's non-official-capacity determination was based on improper fact finding and a misstatement of the IJ's factual findings regarding the likelihood of Ramirez Peyro's arrest and whether he had immunity from prosecution in Mexico.[2]  We agree with both of Ramirez Peyro's arguments.

The IJ explicitly found that "people within the Mexican law enforcement community" would harm Ramirez Peyro, and the BIA accepted this finding.  The IJ specifically outlined two situations supported by substantial evidence in the record in which Ramirez Peyro could be harmed by public officials.  First, as Ramirez Peyro explained, he not only feared that Mexican officials would themselves harm him, but

---

[2] The Government argues in its Motion to Strike Petitioner's Reply Brief that because Ramirez Peyro failed to challenge the BIA's finding that the Mexican government offered him immunity in his opening brief, he has waived the issue.  See Barham v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006).  Contrary to the Government's claim, we are not precluded from considering this argument.  Ramirez Peyro states in his opening brief that "[t]he BIA erroneously found it is not probable he will be detained."  Furthermore, the Government concedes that Ramirez Peyro's opening brief "contests the agency's factual finding that [he] is not likely to be arrested" and that he "claim[s] instead that his torture would be 'under the color of law' because it would occur under the pretext of a lawful arrest in connection with his drug trafficking activities and certain murders."  Ramirez Peyro's argument necessarily incorporates a challenge to the BIA's factual finding that he had immunity; the fact that he is claiming that there would be a lawful arrest in connection with his crimes requires that he not have been granted immunity for those crimes.  See id. (stating that we are not precluded from hearing reply-brief arguments, particularly when they "supplement[] an argument raised in a party's initial brief"); see also Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir. 1986) ("'[W]hat questions may be taken up and resolved . . . is . . . left primarily to the discretion of the courts of appeal, to be exercised on the facts of individual cases.'" (quoting Singleton v. Wulff, 428 U.S. 106, 121 (1976))).  We thus find the Government's contention without merit, consider Ramirez Peyro's argument, and deny the Government's Motion to Strike Petitioner's Reply Brief.

he also feared that they would turn him over to the Cartel, whose members (perhaps including the same police officers) would then harm or kill him. The IJ found this fear credible and indicated that the record supported a finding that Mexican law-enforcement officials could use their positions to learn of Ramirez Peyro's location and reveal that information to the Cartel, thereby allowing that entity to intercept and harm Ramirez Peyro. Again, this finding was uncontested by the BIA. In an extension of that scenario, the IJ also found that because Ramirez Peyro "would be submitted to the normal deportation process" from the United States, Mexican officials would have information about his return—information only obtainable by virtue of their government positions—and, using that information, "would make his presence known to the cartel."

As a result of employing too narrow a definition of "under color of law," the BIA disregarded these IJ findings and improperly made its own determinations regarding the nexus between the officers' official duties and the harm that they would likely inflict upon Ramirez Peyro. More specifically, the BIA overly emphasized the importance of an official arrest in determining the nexus between the officers' duties as government officials and their actions when engaging in harmful behavior. And, as a result, the BIA improperly focused on and opined on the likelihood of Ramirez Peyro's lawful arrest.[3]

---

[3] As mentioned, contained within the IJ's 2005 and 2007 opinions is no explicit finding that the Mexican government offered Ramirez Peyro immunity from prosecution such that he would not be arrested upon his return to Mexico. Furthermore, the testimony during the 2005 and 2007 hearings relating to the likelihood of arrest is unclear. Ramirez Peyro testified during both hearings that a representative from the Mexican Attorney General's office told him that if he testified for the Mexican government, then the Mexican government would grant him immunity from certain crimes. Ramirez Peyro further testified, however, that the grant of immunity was limited to the crimes that he had discussed in his statement to the Mexican authorities, which included crimes "that occurred during the three and a half, four years of working with ICE." His testimony also established that he never

We agree with the BIA that the likelihood of Ramirez Peyro's arrest may have been a factual finding relevant to his CAT claim because if the harm to Ramirez Peyro were to occur under the pretext of a lawful arrest in Mexico, then it is likely that the officials' actions would be "under color of law." See, e.g., United States v. Price, 383 U.S. 787, 792 (1966). We caution, however, that a lawful arrest is but one of several possible circumstances suggested by the record that could impart color of law to the actions of the officers who may be likely to harm Ramirez Peyro. As outlined above, our case law is not so limited, and it contemplates finding color-of-law actions where there is a lesser nexus between the public official's position and the harm that he or she inflicts. Colbert, 172 F.3d at 596–97 (finding that an off-duty officer acted "under color of law" when his status provided him with access to the victim at the jail and the authority to remove the victim from his cell). In focusing only on the likelihood of whether Ramirez Peyro would be taken into official custody, then, the BIA disregarded the other relevant findings to the color-of-law analysis and could not have properly applied the law.

As guidance, we highlight United States v. Price, the facts of which are generally analogous to the situations that the IJ found likely to occur in this case. In Price, a deputy sheriff released three prisoners from their cells in the middle of the

received written confirmation from Mexico that he would not be prosecuted. In 2007, Ramirez Peyro also indicated that while the Mexican government had promised immunity from prosecution, "the only thing that happened as a result of [the conversation] was that . . . an arrest warrant was issued for [him] because of [his participation in] organized crime." In essence, Ramirez Peyro believed that he was subject to arrest and that the Mexican government had "lied" about the fact "that they were going to offer . . . immunity." This testimony was consistent with his statement in 2005 that there was "no way for [him] to know" whether there was a warrant for his arrest in Mexico. The only other finding the IJ made even tangentially related to the likelihood of arrest was the IJ's conclusion that if Ramirez Peyro "were removed to Mexico, he would be submitted to the normal deportation processes, which would call the respondent's attention to the Mexican government." The IJ made no finding as to whether that would lead to an arrest at the border, however.

-15-

night and followed them in his car as they left the jail. Price, 383 U.S. at 790. The deputy sheriff thereafter intercepted the three men and drove them in his official vehicle to a location where he, two other police officers, and fifteen private individuals murdered them. Id. The Supreme Court held that each individual involved in the murders was acting under color of state law because their actions were made possible by the state detention and the police officer's calculated release of the victims. Id. at 794–96. The factual circumstances in Price mirror closely Ramirez Peyro's fear of being turned over to the Cartel by Mexican officials, and, as was the case in Price, it is only by virtue of their roles as officers that many of these officials would even know where Ramirez Peyro was located or how to gain access to him.

Importantly, this case is distinguishable from instances where we have found that a public official was not acting in an official capacity for the purposes of the CAT. In Miah v. Mukasey, for example, we held that substantial evidence supported the BIA's determination that a single elected official's "rogue efforts to take control of other people's property" could not be said to be within his "official capacity" such that it supported CAT relief. Miah v. Mukasey, 519 F.3d 784, 788 (8th Cir. 2008). In Miah, the petitioner testified that a government official had committed several abuses against the petitioner's family, including acts of extreme physical violence and the attempted theft of certain parcels of land. Id. at 786–87. Lacking from the record, however, was evidence that the abuse was commonplace among other government officials. Id. at 788. There was also no evidence indicating a nexus between the official's desire to harm the petitioner and take his land and the official's official duties. Id. For example, there was no indication that the official's official capacity provided him with the means by which to locate, access, and/or harm the petitioner. See id.; cf. Price, 383 U.S. at 792; Colbert, 172 F.3d at 596–97. In essence, Miah addressed an unfortunate, yet isolated, incident of abuse by someone who happened to be a public official. Miah, 519 F.3d at 788; see also Romilus v. Ashcroft, 385 F.3d 1, 9 (1st Cir. 2004) (denying CAT relief when a military officer assaulted the petitioner because the two incidents of abuse "sprang from a personal dispute" and the

-16-

military officer could not, therefore, be "acting in an official capacity when he assaulted [the alien]").

In contrast, Ramirez Peyro is not alleging that he fears isolated harm stemming from a personal dispute or harm from a single rogue officer. The record contains credited evidence and an IJ finding indicating that the Mexican police force is rife with corruption at all but the highest level of government and that attempts to reign in such corruption have been unsuccessful. Furthermore, it is the precise authority with which the Mexican government vests these police officers that provides them with the means and opportunity to harm people such as Ramirez Peyro. See, e.g., Price, 383 U.S. at 790, 793; see also Griffin v. Maryland, 378 U.S. 130, 135 (1964) ("It is irrelevant that [the officer] might have taken the same action had [the officer] acted in a purely private capacity."). As the Second Circuit has indicated, "when it is a public official who inflicts severe pain or suffering, it is only in exceptional cases that we can expect to be able to conclude that the acts do not constitute torture by reason of the official acting for purely private reasons." Khouzam v. Ashcroft, 361 F.3d 161, 171 (2d Cir. 2004).

In conclusion, the BIA's narrow interpretation of "under color of law" led it to disregard many of the IJ's record-supported and uncontested factual findings relevant to whether officials would be acting under color of law and required the BIA to engage in additional, improper fact finding. Given this error, we remand the case to the BIA to allow the agency to properly apply the IJ's factual findings to the correct under-color-of-law standard, as outlined above.

C. Acquiescence to Third-Party Torture While "Acting in an Official Capacity"

Ramirez Peyro also appeals the BIA's determination that he is not eligible for CAT relief based on the acquiescence of public officials "acting in an official capacity" to the actions of "other persons." See 8 C.F.R. § 1208.18(a)(1). The BIA's discussion of its denial of relief on acquiescence grounds is brief, but, in essence, the

-17-

BIA concluded that, even assuming law enforcement would consent or acquiesce to torture at the hands of the Cartel, they again "would not be acting under the pretense of law [but] following a purely personal pursuit" by acquiescing to the Cartel's actions.

To show acquiescence, Ramirez Peyro was required to show that a public official had "awareness" of harmful actions of a third party and "thereafter breach[ed] his or her legal responsibility to intervene to prevent such activity." Id. § 1208.18(a)(7). We find that the BIA failed to fully consider Ramirez Peyro's acquiescence claim and thus remand to the agency for fuller analysis in light of this opinion and the legal standard set forth herein. See Habchy v. Filip, 552 F.3d 911, 915 (8th Cir. 2009) (outlining the BIA's "obligation to consider the evidence . . . presented in light of all of [the] claims").

In its discussion of the acquiescence claim, the BIA inappropriately limited its analysis to whether law-enforcement officials would acquiesce in their official capacities to the Cartel's actions against Ramirez Peyro. This narrow approach fails to recognize that if the agency finds that the officers are not acting "under color of law" when they themselves torture or observe torture, then the BIA must also consider those officers as third-party, private actors for the purposes of the acquiescence analysis. The officers Ramirez Peyro alleges will engage in harmful actions against him (whether it be via the performance or the mere observation of torture) are also responsible for stopping such crimes. As such, further inquiry is needed as to whether the officers would be breaching their "legal responsibility to intervene" under the color of law when they fail to arrest themselves, their co-workers, or others assaulting Ramirez Peyro. See 8 C.F.R. § 1208.18(a)(7).

Because the essence of law-enforcement officials' jobs is to prevent the precise type of harm that Ramirez Peyro fears, a failure to act in response to that impending harm almost necessarily implies that the acquiescence will occur in an official

capacity. The officials who watch or engage in torture not under color of law and fail to act to punish the perpetrators are not intervening, in part, because to do so would require acknowledgment of extensive corruption in the police force. This acknowledgment would undermine any individual officers' or commanding officers' authority as well as undermine the appearance of the effectiveness of the Mexican government's efforts to rid the police force of corruption generally. See, e.g., Zheng v. Ashcroft, 332 F.3d 1186, 1194 (9th Cir. 2003) (remanding for the application of the appropriate acquiescence-in-an-official-capacity standard following a discussion of the Chinese government's refusal to prevent private violence because the government pretended that the third-party actors, as a group, did not exist and to acknowledge the group's existence would undermine the government's authority).

It is the wide-scale police participation in harmful actions on behalf of the Cartel (while the police are private citizens), their return to work thereafter (with the resumption of their public-official status and the requisite duty to stop the type of behavior in which they themselves have engaged), and the government's general knowledge of the activity that may distinguish the present case and cases like Zheng from those where a government is merely unable to control third-party torturers despite concerted attempts. See, e.g., Miah, 519 F.3d at 788; Bartolo-Diego v. Gonzales, 490 F.3d 1024, 1029 (8th Cir. 2007) ("Even though the government's failure to investigate and punish other individuals and clandestine criminal groups who break the law has resulted in human rights abuses, the failure is due more to a weak and inefficient judicial system than to government acquiescence or approval."); cf. Tunis v. Gonzales, 447 F.3d 547, 551 (7th Cir. 2006) (finding the government's inability to control the private actors was irrelevant to the acquiescence analysis when "[f]emale circumcision is legal . . . , [and] obviously well known to the government").

Ramirez Peyro's testimony during his 2007 hearing indicated that few, if any, of the police officers involved in the killings that Ramirez Peyro witnessed have been arrested in Mexico. And while the Government claims that there is "ample evidence

of extensive actions by the Mexican government to weed out corrupt officers acting in collusion with drug cartels"—which it argues precludes a finding that public officials are acquiescing to the harmful actions of private individuals—the public officials capable of acquiescing to torturous actions do not include only those occupying high levels of government but can include the individual police officers themselves and their supervisors. Cf. Menjivar v. Gonzales, 416 F.3d 918, 922 (8th Cir. 2005) (indicating that in certain circumstances facts specific to the petitioner may trump the general country background information). As mentioned above, the harm Ramirez Peyro fears at the hands of corrupt law enforcement and the Cartel is not isolated. It appears, in fact, that police abuses at the local and state level may be fairly characterized as "routine." Cf. Khouzam, 361 F.3d at 171 ("To the extent that these police are acting in their purely private capacities, then the 'routine' nature of the torture and its connection to the criminal justice system supply ample evidence that higher-level officials either know of the torture or remain willfully blind to the torture and breach their legal responsibility to prevent it."). Further inquiry is needed, however.

## III.

Finally, we feel compelled to address the BIA's statement regarding Ramirez Peyro's "assumption of the risk," as it were. Despite its recognition that Ramirez Peyro "faces a high risk of severe harm upon return to Mexico," and almost certain death, the BIA noted that "violence is an 'occupational hazard' of the illicit drug trade" and admonished Ramirez Peyro for "court[ing] this risk through his own actions." While Ramirez Peyro may have been involved in illicit actions before becoming an ICE informant, his claim for CAT relief is not based on generalized fears of violence stemming from his involvement in the drug trade, but rather, it is based on the very particularized fear that he will be killed because he worked in concert with the U.S. government to help arrest and convict numerous dangerous international drug traffickers. In this case, the violence Ramirez Peyro faces, if anything, is an occupational hazard of working on behalf of the U.S. government, and, surely, this is

-20-

not the type of hazard that we would like to encourage would-be informants to avoid for fear of it being used against them when they seek protection.

## IV.

We grant Ramirez Peyro's petition for review, vacate the BIA's opinion, and remand for proceedings consistent with this opinion.

_____